William A. Levin (SBN 98592)
Laurel L. Simes (SBN 134637)
David M. Grimes (SBN 324292)
**LEVIN SIMES LLP**
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile:  (415) 426-3001
Email: wlevin@levinsimes.com
Email: llsimes@levinsimes.com
Email: dgrimes@levinsimes.com

*Attorneys for Plaintiff* JANE DOE LS 348

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE LS 348,<br><br>                              Plaintiff,<br><br>               vs.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation; RASIER, LLC, a Delaware Limited Liability Company; RASIER-CA, LLC, a Delaware Limited Liability Company; and DOES 1 through 50, Inclusive,<br><br>                              Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1.  **GENERAL NEGLIGENCE**<br>2.  **COMMON CARRIER NEGLIGENCE**<br>3.  **NEGLIGENT MISREPRESENTATION**<br>4.  **INTENTIONAL MISREPRESENTATION**<br>5.  **VICARIOUS LIABILITY/LIABILITY FOR THE TORTS OF UBER DRIVERS**<br>6.  **VICARIOUS LIABILITY FOR FALSE IMPRISONMENT**<br>7.  **VICARIOUS LIABILITY FOR SEXUAL ASSAULT**<br>8.  **VICARIOUS LIABILITY FOR SEXUAL BATTERY**<br>9.  **STRICT PRODUCT LIABILITY – DESIGN DEFECT**<br>10. **STRICT PRODUCT LIABILITY – FAILURE TO WARN** |

Jane Doe LS 348 ("Plaintiff") by and through her attorneys of record, for causes of action against

Uber Technologies, Inc. ("Uber"), a Delaware corporation with its principal place of business in San

Francisco, California, Rasier, LLC ("Rasier"), a Delaware limited liability company with its principal

place of business in San Francisco, California, and Rasier-CA, LLC ("Rasier-CA"), a Delaware limited liability company with its principal place of business in San Francisco, California, and Does 1 through 50, inclusive, and each of them, complain and allege the following:

## __INTRODUCTION__

1. Uber is a transportation company headquartered in San Francisco, California. Beginning in 2009, Uber created a transportation system that has been implemented around the world, including across the entire United States.

2. Passengers pay Uber a fee in exchange for safe passenger to their destination. Uber's public representations claim that "safety is our top priority" that "it is our goal to make every ride safe, comfortable, and reliable." In reality, Uber's priority is not passenger safety. Profits are Uber's priority. As a result, female passengers, such as plaintiff, continue to be attacked by sexual predators driving for Uber.

3. As early as 2014 Uber became aware that Uber drivers were sexually assaulting and raping female passengers. Since 2014, sexual predators driving for Uber have continued to sexually assault, harass, falsely imprison, kidnap, physically assault, and/or rape Uber's passengers.   Complaints to Uber by female passengers who had been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that at least as early as 2019 Uber has been fully aware of these continuing attacks by sexual predators driving for Uber.

4. While Uber has, in recent years begun to publicly acknowledge this sexual assault crisis, including the publication of Uber's U.S. Safety Report in December 2019, Uber's response to this sexual predator crisis amongst Uber drivers has been appallingly inadequate. Uber continues to hire drivers without performing adequate background checks. Uber continues to allow drivers who engage in sexual misconduct and sexually assaulting passengers to keep driving for Uber. And, perhaps most importantly, Uber has failed to adopt and implement reasonable driving monitoring procedures designed to protect the safety of its passengers. As a consequence, Uber passengers continue to be the victims of sexual assaults and rapes by Uber drivers.

5. Corporate decision-making with respect to passenger safety issues is centered at Uber's corporate headquarters in San Francisco. Decisions with respect to the vetting of Uber drivers and the

Levin Simes LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

supervision of Uber driver's vis a vis the safety of its passengers are made and implemented in its San Francisco, California headquarters.

## PARTIES

6.      Plaintiff is over the age of 18 and is a resident of the State of Arizona. The incident occurred in Phoenix, Arizona.[1]

7.      Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California, 94158. Defendant Uber Technologies, Inc. has been served with process through its registered agent, CT Corporation System.

8.      Defendants Rasier, LLC and Rasier-CA, LLC are Delaware limited liability companies. Upon information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier, LLC and Rasier-CA, LLC maintain a corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, California, 94158.

9.      Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC collectively as "Uber."

10.      The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore sue said Defendants by such fictitious names.  The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff.  Plaintiff is informed and believes, and thereon allege, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff.  Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

11.      Plaintiff is informed and believes, and on that basis alleges, that at all times herein

---

[1] Plaintiff Jane Doe LS 348 files this action under a pseudonym as she is a victim of sexual assault. Plaintiff proceeds in this manner to protect her legitimate privacy rights as further disclosure would expose her to stigmatization and invasion of privacy.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

mentioned, each of the defendants herein was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each of the remaining defendants, and was at all times herein mentioned acting within the course and scope of said relationship when Plaintiff was injured as set forth herein.

12.     Plaintiff is informed and believes that each and every Defendant, when acting as a principal, was negligent in the selection, hiring, supervision or retention of each and every other Defendant as an agent, servant, employee, assistant, or consultant.  Plaintiff is further informed and believes, and thereon alleges, that at all times herein mentioned, each business, public entity  or corporate employer, through its officers, directors, supervisors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thereby ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each public entity, and corporate defendant by and through its officers, directors, supervisors and managing agents, and each individual defendant, authorized and ratified the wrongful conduct herein alleged.

13.     Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego and other forms of vicarious liability.

14.     In the instance of each sexual assault described below, the Uber driver who perpetrated each assault described herein ("Uber Driver(s)") was an agent, servant, and employee of Uber.

15.     This Complaint refers to Defendant Uber Technologies, Inc., Defendant Rasier, LLC, Defendant Rasier-CA, LLC, and Does 1 through 50, inclusive, as Defendants.

## JURISDICTION & VENUE

16.     Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000. Plaintiff is a resident and citizen of the State of Arizona. Defendant Uber Technologies, Inc. is incorporated in the State of Delaware and maintains its principal place of business in San Francisco, California. Defendant Rasier, LLC is a Delaware based limited liability company. Defendant Rasier-CA, LLC is a Delaware based limited liability company. Therefore, the parties are diverse.

17.     Personal Jurisdiction over Defendants is appropriate because all have their principal

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

places of business in California, and all intentionally avail themselves of the benefits and protection of California law such that the exercise of jurisdiction by the California courts is consistent with traditional notions of fair play and substantial justice.

18.     Venue is proper under 28 U.S.C. § 1391(b)(1) as Defendants reside in this district.

## FACTUAL ALLEGATIONS

19.     Uber was founded in 2009, originally as UBERcab. In 2011, Uber launched is mobile application in San Francisco, California and changed its name to Uber Technologies, Inc.

20.     In May 2019, Uber became a public company via an initial public offering. As of 2019, Uber controlled approximately 67% of the ride-sharing market in the United States. Uber's mobile application is currently available in 72 countries and in over 10,000 cities worldwide.

21.     Uber designs, manufactures, produces and/or distributes a smart phone application ("Uber App") available to anyone to download onto a smart phone. First, a customer, using the Uber App, requests a ride in a motor vehicle. The Uber App matches the customer with an Uber driver, who is then dispatched to pick up the customer and drive them to their destination.  Uber controls every aspect of the financial transaction for each passenger trip between the customer, Uber, and the driver. Uber establishes the rate for a given ride by performing a calculation based upon the location information from the GPS-enabled mobile device and the destination.  Uber drivers may not negotiate fares. Uber receives the customer fare by charging a standardized fee to the credit card that the customer provides to Uber when registering his or her personal information on the Uber app. Uber pays the Uber driver's portion of the fare to the driver. UBER retains a portion of every fare paid. Neither drivers nor riders are charged a fee to download the UBER App or a monthly subscription fee; instead, Uber's sole revenue source is fees from rides given.

22.     The UBER App is a product designed, patented, and/or distributed by Uber in San Francisco, California. It is a product, designed and intended to "connect riders looking for transportation to independent transportation providers…looking for riders."  The Uber App processes payments for rides, tracks the rides, and acts as a platform for Uber drivers to be connected to passengers.

23.     As detailed *infra,* Uber's business model is predicated upon having a large pool of available drivers in a given city in order to provide rides to as many customers as possible in as short a time as

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

possible. To the extent, important public safety measures such as requiring cameras, robust background checks and suspending problem drivers impact the pool of drivers.

24.     Uber has falsely marketed itself as a safer, better alternative to other methods of transportation, particularly targeting young, intoxicated women and late-night riders with false representations that it enforces state-of-the-art safety policies and procedures. Specifically, Uber markets itself as a better and safer alternative to taxis and advertises its services as the "safest ride on the road" and "a ride you can trust;" it emphasizes its "focus on rider safety before during and after every trip," and represents to customers that "[e]very ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards," which "includes a three-step criminal background screening for the U.S.—with country, federal and multi-state checks that go back as far as the law allows—and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

25.     Additionally, Uber markets itself as the best transportation option after a night of drinking. In fact, Uber commissioned a report with Mothers Against Drunk Driving ("MADD") wherein it declared that, "When empowered with more transportation options like Uber, people are making better choices that save lives."[2]  Uber urged that, "Uber and MADD are working toward a world where a safe ride is always within reach and where drunk-driving is a thing of the past."[3]  Uber has also partnered with alcohol sellers touting itself as the safe option for arriving home when intoxicated, such as its promotional campaign with Budweiser, suggesting that one can "get home safe" after drinking with a free Uber ride.[4]

26.     What Uber does not make clear to its users, particularly young women who have been drinking, is that by choosing to ride with Uber after drinking, they are putting themselves at risk for sexual assaults at the hands of sexual predators who driver for Uber.

27.     Over the last decade, Uber, including Uber's officers, directors and/or managing agents, became aware that Uber drivers were sexually assaulting and raping female customers.  At least as early

---

[2] https://www.Uber.com/newsroom/reasons-to-ride/

[3] Id.

[4] https://www.campaignlive.co.uk/article/budweiser-partners-Uber-biggest-responsible-drinking-campaign-date/1417545

as 2014, sexual predators driving for Uber have continued to assault and rape Uber's female passengers. At least as early as 2014, Uber, including Uber's officers, directors and/or managing agents, has known about the ongoing sexual assaults and rape by Uber drivers upon Uber customers. Complaints to Uber by female customers who have been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber, including Uber's officers, directors and/or managing agents, has been fully aware of these continuing attacks by sexual predators driving for Uber.

28.     Uber's response to this sexual predator crisis amongst Uber drivers has been appallingly inadequate. Uber, at the direction of Uber's officers, directors and/or managing agents, continues to hire drivers without performing adequate background checks. Uber continues to allow drivers who have prior complaints of rape and sexual assault lodged against them to keep driving for Uber.  And, most importantly, Uber, at the direction of Uber's officers, directors and/or managing agents, has failed to adopt and implement reasonable driver monitoring procedures including video surveillance designed to protect the safety of its passengers. As a result, Uber's passengers continue to be victims of sexual assaults and rapes by Uber drivers.

29.     Uber, at the direction of Uber's officers, directors and/or managing agents, understands that reports of rape and sexual assault by Uber drivers are not good for Uber's business model.  On December 5, 2019, Uber first published a 2017-2018 US Safety Report which identified 5,981 instances of sexual assault that were reported to Uber as having occurred during an Uber ride.  Prior to 2019, Uber did not publically disclose the sexual assault risk to the public and the 2019 disclosure was inadequate. More importantly, Uber, at the direction of Uber's officers, directors and/or managing agents, has continually failed to take any meaningful steps to enact safety measures which would prevent these sexual assaults and rapes from occurring in the first place.

30.     Uber corporate management, including Uber officers, directors and/or managing agents, has failed to implement the most basic and rudimentary procedures for the proper investigation of sexual assaults that are reported in their vehicles.

31.     Uber has continued to let sexual predators drive and interact with vulnerable members of the public after Uber has received reports of sexual assaults by these predatory drivers. In many instances,

Uber has allowed sexual predators to continue driving after Uber learned of the assaults committed by those drivers.

32.     Corporate decision-making with respect to passenger safety is centered at Uber's corporate headquarters in San Francisco, California.   Corporate decision-making with respect to policies and procedures for training and supervising drivers regarding sexual assault are centered at Uber's corporate headquarters in San Francisco, California. Corporate decision-making with respect to how Uber handles reports of sexual assault is centered at Uber's corporate headquarters in San Francisco, California. Corporate decision-making and corporate instructions to Uber employees with regard to refusing to cooperate with law enforcement investigating assaults of their drivers is centered at Uber's corporate headquarters in San Francisco.  Decisions with respect to the vetting of Uber drivers and the supervision and non-supervision of Uber drivers, *vis a vis* the safety of its passengers, are made and implemented in its San Francisco headquarters. Corporate decision-making with respect to Uber's decision not to report sexual assaults to law enforcement and other ride sharing companies that employ the assailants is centered at Uber's corporate headquarters in San Francisco.  Decisions with respect to the design of the Uber App and implementation of changes with the Uber App that effect passenger safety are made and implemented in its San Francisco headquarters.   Corporate decision-making with respect to Uber's policies and procedures to allow reported sexual predators to continue to drive for Uber is centered at Uber's corporate headquarters in San Francisco.  Decisions regarding Uber's contract with Uber customers specifies that the agreement should be governed by California law.  The specific officers, directors and/or managing agents responsible for the policies and procedures guiding Uber are centered at Uber's corporate headquarters in San Francisco, California.

## UBER'S INADEQUATE SAFETY PRECAUTIONS AND INADEQUATE SCREENING

33.     Uber employs its drivers through the Uber application, where the driver applicant merely has to download on his or her smartphone.

34.     Even today, the hiring of Uber drivers occurs without any real screening. Potential Uber drivers merely fill out a form online. There is no interview either in person or through online platforms such as Skype or Zoom. There is no biometric fingerprinting or fulsome criminal background checks.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

There is no verification that the social security numbers and other personal identification numbers submitted through the application process do, in fact, belong to the applicants. UBER does not verify vehicle ownership, conduct physical vehicle inspections, require applicants to pass road vehicle tests or vision and hearing exams, or require applicants to attend any training classes on safe driving skills. UBER does not require applicants to attend any training class of training materials as to how to safely use mobile apps such as the UBER App while driving. There has been no sexual assault training. Almost all online applicants become drivers. Almost all online applicants become drivers.

35.     Once an Uber applicant becomes a driver, Uber fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains om course to the passenger's destination.

36.     Uber does not have a zero-tolerance policy for misconduct and has allowed driver who have been reported for behavior that threatened the safety of its passengers to continue driving.

37.     Uber fails to engage investigators to perform ongoing audits of current drivers' applications and information to weed out any inaccurate, outdated or forged information or criminal convictions occurring since the driver applied with Uber.

38.     Uber, including Uber officers, directors and/or managing agents, does not require non-harassment training. Uber does not adequately investigate customer complaints of sexually inappropriate behavior or serious sexual assaults.  Uber does not employ experts dedicated to investigating complaints made against its drivers of a violent or sexual nature. Uber does not bar registered sex offenders or individuals with rape convictions (at any point in the past) from becoming Uber drivers. Notwithstanding Uber's history of hiring sexual predators who have assaulted Uber passengers, Uber does nothing to warn its female passengers about the serious and real danger of being sexually assaulted by an Uber driver.

39.     Uber is and has been aware that its security screening processes are insufficient to prevent dangerous and violent applicants from successfully registering as Uber drivers.

**UBER'S FINANCIAL MODEL**

40.     The key to Uber's business model is to have as many Uber drivers on the road as possible. To achieve this, Uber endeavors to have as many new Uber drivers on the road as possible by soliciting and retaining thousands of non-professional drivers. The more Uber drivers and Uber rides,

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

the more money Uber makes. Unfortunately, careful and adequate screening processes and driver supervision would result in fewer drivers and lower profits.  Uber employs its drivers in traditional at-will relationships, in which Uber has the discretion to fire its drivers for any reason and at any time.

41.     Uber has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, Uber's business model and driver enrollment process is designed to accept as many new drivers as possible.  Unfortunately, Uber, including Uber officers, directors and/or managing agents, prioritizes profits over passenger safety.

42.     Uber's goal of dominating the ridesharing market has been a success because Uber ignores licensing laws and disregards customer safety. While taxi and limousine companies must comply with licensing laws and vehicle and consumer safety protections, Uber openly and intentionally disregards long-standing legal and regulatory authorities in nearly every U.S. city in which it operates. Without the costs of complying with legal and safety requirements and taking necessary precautions to ensure consumer protection, Uber has become dominant in the market in a fraction of the time it would have taken had Uber done things properly and safely for its passengers.  Uber's model of "profits over safety" is the cornerstone of its market dominance.

43.     As a result of prioritizing profits over passengers, Uber, at the direction of Uber officers, directors and/or managing agents, has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn customers of the dangers of riding with Uber.

### UBER'S CONTROL OVER ITS DRIVERS

44.     Uber drivers are largely nonprofessional, untrained individuals who use their own vehicles. Uber employs and engages its drivers, including Uber Driver, in traditional at-will relationships.

45.     Uber collects a percentage of the fee from every ride. Uber takes a fee ranging between twenty percent (20%) and thirty percent (30%) of the fare charged to a consumer for a ride.

46.     Uber can and does directly modify charges to consumers to the extent that Uber determines that a driver has taken a circuitous route to a destination.

47.     Uber controls its drivers' contacts with its consumer base, and considers its consumer

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

list to be proprietary information.

48.     Uber drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber app.

49.     Uber requires its drivers to accept all ride requests when the drivers are logged into the Uber app. Drivers who reject too many ride requests risk discipline by Uber, including suspension or termination.

50.     Uber attempts to impose uniformity in the conduct of its drivers.

51.     Uber retains the right to terminate drivers at will, with or without cause. Uber uses rider feedback to discipline or terminate drivers.

52.     Uber processes and deals with customer complaints regarding drivers and maintains the driver rating system used by customers.

53.     Uber maintains a "master-servant" relationship with all Uber drivers.

54.     Uber drivers are subject to Uber's control while performing those services.

55.     Uber retains the right to direct and does indeed direct how the work of all Uber drivers shall be done, as well as the result to be accomplished.

56.     Uber merely retain not the drivers' work but also retains, and does exercise, the ability to control the means whereby the work is to be accomplished.

57.     Uber has, retains, and exercises the right to control the manner and means of accomplishing the result desired of its drivers and Uber exercises that right at all times.

58.     Uber retains far more than merely a broad general power of supervision and control as to the results of the Uber drivers' work.

59.     Uber retains the right to control all aspects of the divers work over its drivers, including but not limited to the following:

a.   Uber has the discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

b.   Drivers are not charged a fee by Uber to apply to become employees;

c.   At all times relevant, there was no agreement between Uber and driver designating the driver as an independent contractor;

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

d.   Drivers are not charged a fee to download the app or to receive notifications from Uber that customers want rides;

e.   Fare prices for rides are set exclusively by Uber;

f.   Drivers have no input on fares charged to consumers;

g.   Drivers are not permitted to negotiate with consumers on fares charged;

h.   Uber establishes the driver requirements;

i.   Uber establishes the vehicle requirements;

j.   Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

k.   Uber takes a fee of every ride charged to a consumer which generally exceeds twenty-five percent of the fare;

l.   Uber retains control over customer-contact information;

m.   Uber controls its drivers' contacts with its consumer base and considers its consumer list to  be proprietary information;

n.   In some instances, Uber controls the hours a driver works;

o.   Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

p.   Drivers must abide by a list of regulations to drive for Uber;

q.   Uber requires its drivers to pick up Uber customers on the correct side of the street;

r.   Uber forbids its drivers from talking on their cell phones while the drivers are driving customers;

s.   Uber tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

t.   Uber drivers are expected to accept all ride requests while they are logged into the App. Uber Drivers who reject too many ride requests risk facing discipline, including suspension or termination;

u.   Uber provides its driver with and requires them to use and display Uber branding materials in order to make their drivers easily identifiable as Uber drivers.

v.   Uber allows its passengers to give feedback on rides they have taken, and rate drivers on a scale from one to five stars. Prior complaints about the Uber driver are not shared with other passengers. Uber passengers are not provided with any background information regarding their driver other than a photograph and other basic information about the vehicle.

60.    Consistent with its role as a common carrier, UBER prohibits drivers from refusing to provide services based on race, national origin, religion, gender, gender identity, physical or mental disability, mental condition, marital status, age, or sexual orientation.

61.    Consistent with its role as a common carrier, Uber expects its drivers to comply with all relevant state, federal, and local laws governing the transportation of riders with disabilities, including the transporting of service animals.

62.    Consistent with its role as a common carrier, Uber is liable for assaults regardless of whether such acts were committed within the course and scope of employment for Uber.

63.    Uber provides auto insurance for drivers who do not maintain sufficient insurance on their own.

64.    Insurance provided by Uber covers incidents occurring while a driver is connected online with the Uber app, with coverage increasing when a riding customer is in the vehicle.

65.    Uber retains and maintain insurance covering sexual assaults perpetrated by Uber drivers upon Uber passengers.

66.    Uber provides its drivers with logo stickers for their windshield and rear window and trains them that these stickers must be displayed in compliance with the California Public Utilities Commission ("CPUC") standards.

## UBER'S AGGRESSIVE MARKETING EFFORTS AND MISREPRESENTATIONS ABOUT SAFETY

67.    Since its inception, Uber has actively marketed itself as a safe company that provides safe rides.

68.    Both before 2014 and after, Uber actively and aggressively marketed the supposed safety of its transportation services.  These efforts continue to this day, and include email messages sent to

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

1   every Uber customer, including Plaintiff.

2       69.     Uber represented to its customers, including Plaintiff, on its website all of the following:

3       70.     "How we help keep you safe – We're committed to helping you get where you want to go

4   with confidence, whether it's building emergency features in the app or making it easy for you to check

5   your ride."

6       71.     "Ride with confidence – The Uber experience was built with safety in mind. Through

7   incident prevention tools, insurance coverage, and technology that keeps you connected, we're

8   dedicated to helping you move safely and focus on what matters most."

9       72.     "Ride with confidence – Designing a safer ride – driver screenings – All potential drivers

10  in

11  the US must complete a screening before becoming an Uber driver-partner, and current drivers continue

12  to be vetted for criminal offenses."

13      73.     "Ride with confidence – Designing a safer ride – On every trip, you can tap a button for

14  safety tools and get help whenever you need it."

15      74.     "Ride with confidence – Designing a safer ride – An inclusive community – Through our

16  joint efforts with cities and safety experts and by working together, we're helping to create safe

17  journeys for everyone."

18      75.     "Our commitment to safety – You deserve to be able to move safely. To look forward to

19  the opportunities ahead. To be connected to people and places that matter most. Which is why we're

20  focused on your safety, from setting new standards to developing technology with the goal of reducing

21  incidents."

22      76.     "How safety is built into your experience – Safety features in the app – Tap a button for

23  emergency assistance. Share your trip details with loved ones. Our technology helps put peace of mind

24  at your fingertips."

25      77.     "How safety is built into your experience – An inclusive community – Millions of riders

26  and drivers share a set of Community Guidelines, holding each other accountable to do the right thing."

27      78.     "How safety is built into your experience – Coverage on every trip – We've put insurance

28  from leading companies in place for every ride."

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

79.     "Building safer journeys for everyone – Rider safety – Uber driver-partners in the US go through a multi-point screening check for their driving and criminal history before they are authorized to take trips through the app. Every rider has access to safety features built into the app and a support team if you need them."

80.     "The future of safety – More than 200 Uber employees, from researchers and scientists to designers and engineers, are focused on building technology that puts safety at the heart of your experience."

81.     "Safe rides around the clock – Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

82.     "[W]herever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, and then working hard to improve them every day."

83.     Uber actively and publicly markets its transportation services to be safe and reliable services.

84.     Uber has cultivated an image among its customers of safety and has falsely claimed superiority over public transportation and traditional taxis. Because of aggressive and deceptinve marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to believe a ride with Uber is a safer and better alternative.

85.     In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

86.     Riders, including Plaintiff, reasonably rely on Uber's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Uber as a result of this reliance.

87.     Uber knew its representations and promises about rider safety were false and misleading yet Uber continued to allow riders to believe in the truth of these representations and promises and continued to profit from the fact that Uber passengers rely on those representations and promises.

### UBER'S BACKGROUND CHECKS

88.     Uber fails to conduct adequate background checks and screening of its drivers. Uber does

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

not fingerprint its drivers, Uber does not run the applicant drivers against all available US public databases, and Uber does not perform international background checks.

89. Even where authorized to do so, Uber generally does not perform driver background checks. Instead, Uber outsources the checks to a third-party vendor that actually limits the scope and extent those background check and that does not verify the information provided by the applicant is accurate or complete. The background checks conducted by private companies for Uber do not require any fingerprinting or anycomparison against Department of Justice and Federal Bureau of Investigation databases. Neither Uber not the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for an Uber background check is often under 36 hours.

90. Because of the unique identifying characteristics of fingerprints, the Live Scan process would provide assurance that the person whose criminal history has been run is, in fact, the applicant. This would ensure that a violent criminal could not use a false identification to become an Uber driver.

91. Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These limited "name based only" criminal background checks are based only upon records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, Uber's background check do not include a true national search , making these searches incomplete, limited and inaccurate.

92. Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Likewise, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes her name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

93. Uber has refused to adopt fingerprint-based biometric checks and has in fact spent millions of dollars lobbying against local regulations requiring these checks.

94. Uber lobbies state and local governments to limit what is required with respect to driver

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone 415.426.3001 fax

background checks.  Uber also lobbies local government entities to continue allowing Uber to perform its own limited background checks of its driver applicants, and resists any requirement that the municipalities perform the more stringent screening which they perform for traditional taxi drivers.

95.     Uber has successfully persuaded lawmakers in several states to limit the scope of the background check requirements for its drivers limited.

96.     As a direct result of Uber's lobbying efforts, Uber largely self-enforces hiring standards for their drivers.

97.     Despite Uber's aggressive advertising to passengers that "Your safety is important" and "Safety is our top priority," as described above, Uber's background check process is designed for speed, not safety. In refusing to adopt reasonable safety procedures and more robust driver screening Uber makes clear that its priority is profit, not passenger safety.

98.     The application process to become an Uber driver is simple, fast, and designed to allow the company to hire as many drivers as possible while incurring minimal associated costs. Uber lobbied for and implemented a less robust hiring process knowing it would be at the expense of passenger safety.

## MANDATORY REPORTING OF SEXUAL ASSAULT

99.     Uber, at the direction of Uber officers, directors and/or managing agents, has actively chosen not to report instances of sexual assault that occur on the Uber App to the authorities.

100.     The benefits and rationale for mandatory reporting of sexual assault is undisputed and well documented.  One of the most obvious reasons for the policy of mandatory reporting of sexual assault would be to reduce the prevalence of sexual assault and preventing future sexual assault and the lives that can be destroyed by sexual assault. Despite the knowledge that adopting a policy of mandatory reporting will help prevent future assaults and increase passenger safety, Uber at the direction of Uber's officers, directors and/or managing agents, has adopted a policy that is the opposite of mandatory reporting. Uber simply does not report allegations of rape and brutal sexual assault to the police. Instead, Uber makes every effort to hide and conceal these sexual assault reports from law enforcement, the public, media and our courts.

101.     Uber understands that their drivers often drive for Lyft, Inc. (LYFT) and other

Levin Simes LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

ridesharing companies. Uber also understands that sexual predators are likely to continue committing sexual assault. Despite the knowledge of the benefits of reporting sexual assailants, Uber does not report sexual assaults and rapes to law enforcement and did not share information regarding sexual assaults and rapes with other ridesharing companies despite the knowledge that these drivers are employed by other ridesharing companies. Uber, at the direction of Uber's officers, directors and/or managing agents, has adopted a policy that knowingly hides and conceals the identities of the drivers that rape and sexually assault Uber passengers.

102.   Uber claims to be concerned about public safety and yet has more sexual assaults than almost any other company in US history, as evidenced by their 2017-2018 US Safety Report. Nevertheless Uber has failed to adopt a zero-tolerance policy and have mandatory reporting of sexual assaults to law enforcement and other ride sharing companies.  Instead, Uber officers, directors and/or managing agents have chosen to sacrifice the well being of of sexual assault victims in the hope of deriving additional profits.

103.   Publishing Uber's 2017-2018 US Safety Report is simply not enough.  Stating that the statistics of sexual assaults in Uber vehicles will be reported every two years is not enough to protect women and prevent sexual assaults in the first place. Uber, at the direction of Uber's officers, directors and/or managing agents, refuses to adopt mandatory reporting and report the crimes being committed by Uber drivers on Uber rides to law enforcement agencies. This clearly sends the message to sexual predators that not only will they have access to women in enclosed vehicles, but their attacks on these women will go unreported to law enforcement by Uber.

## STONEWALLING LAW ENFORCEMENT

104.   Uber's attempts to conceal its problem of sexual assaults is not limited to its refusal to report instances of sexual assaults to the authorities.  Uber's attempts to conceal the problem of sexual assaults occurring through the Uber App are further evidenced by its lack of cooperation with law enforcement detectives that investigate the cases that victims report to police.  Uber has failed to provide records and documentation, regarding sexual predators that have committed multiple assaults, that would be critical for law enforcement investigations.  The net effect of Uber's attempts to protect itself and conceal the reports of sexual predators from law enforcement is that dangerous sexual

predators continue to rape, sexually assault and devastate the lives of victims.

105.    Although in recent years, Uber has implemented a law enforcement portal (Law Enforcement Response Team) where law enforcement agencies can submit their requests for information.

106.    Many law enforcement personnel have reported that this process is incredibly time-consuming and unwieldy to use, which hampers and slows investigations-probably the reason Uber has adopted it.

107.    Upon information and belief, even with their implementation of the law enforcement portal in recent years, Uber, at the direction of its officers, directors and/or managing agents, has refused to cooperate with local law enforcement, instead requiring local law enforcement to obtain court orders to force Uber to cooperate.

108.    A responsible company concerned with public safety would cooperate with law enforcement. Uber has chosen another path.  Uber delays and restricts correspondence with police until a court order/search warrant is authorized.  In many cases, Uber requires a subpoena or formal legal order to provide information police may need for an investigation.  Many of the assault victims are told by the detectives handling their case that Uber's Trust and Safety team is unresponsive to the detective's requests.

109.    UBER often erases a victim's complaint from the Uber App and does not send the victim or law enforcement a copy of what the victim sent to Uber regarding the assault.  In these cases, the victim has no way to access or retrieve their original complaint about the accused perpetrator, which delays the police investigation.

110.    After a victim has reported a rape or sexual assault, Uber often disables the victim's account.  This restriction prohibits the victim from accessing key information about their perpetrator including the name, photo, make and model of the car, the time, distance, and route of ride, and other identifying information which is needed for law enforcement's investigation.  This further hampers law enforcement investigations.

111.    Uber is fully aware that it is stonewalling and hampering the efforts of law enforcement investigations as described above.  Uber, at the direction of Uber's officers, directors and/or managing

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

1   agents, knowingly protects the sexual predators that drive for them.

2       112.    The Uber ride-hailing platform is a haven for sexual predators preying on vulnerable

3   women.

4   **UBER POLICY IGNORES AND SILENCES SEXUAL ASSAULT VICTIMS**

5       113.    Many people that are sexually assaulted do not report the incident because of the stigma

6   attached to sexual assault.  Only a minority of courageous people that are sexually assaulted come

7   forward to report the assault.  It is well known that sexual assault victims suffer tremendous mental and

8   psychological trauma as a result of being victimized by sexual assault.  For this reason, any responsible

9   organization, corporation or entity that takes calls from sexual assault victims should have trauma

10  informed persons trained in sexual trauma to handle those calls.

11      114.    Despite the hundreds and thousands of calls reporting sexual assault to their company,

12  Uber has untrained operators acting as first responders that take the calls from traumatized sexual

13  assault survivors.  These untrained operators have no concept or understanding of how to communicate

14  with a sexual assault survivor.  Oftentimes sexual assault victims get automated and recorded messages.

15  All the above is has the effect of ignoring or silencing victims and has been implemented at the

16  direction of Uber's officers, directors and/or managing agents.

17      115.    In addition to the above allegations, Uber policies have the impact of ignoring and

18  silencing victims.  Oftentimes when a victim comes forward and reports a sexual assault or rape, Uber

19  responds by turning off or deactivating the victim's Uber App.

20      116.    When a victim has the courage to come forward to report the assault, Uber does not tell

21  the victim to report the incident to the police or other law enforcement. Rather, Uber tells the sexual

22  assault victim that Uber will investigate the incident and get back to them. Unfortunately, Uber

23  oftentimes does not get back to the victim despite their promise to do so. The victim often never hears

24  from Uber about the incident again.

25      117.    Uber often erases the victim's complaint from their Uber App.

26      118.    Uber, at the direction of Uber's officers, directors and/or managing agents, often enlists

27  Crawford Global Technology Services ("Crawford GTS"), an international insurance adjustment

28  company who touts themselves as the "most experienced team of strategic loss managers and technical

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

adjusters in the world." Upon information and belief, Uber, at the direction of Uber's officers, directors and/or managing agents, employs Crawford GTS to contact women who have reported sexual assaults after the report is made, in an effort to pay off and silence victims.

119.   Uber employs all of the above policies to silence victims.

### UBER RESPONDS INADEQUATELY TO RIDER REPORTS OF SEXUAL ASSAULTS

120.   Uber riders who report sexual harassment or sexual assault to Uber are often left feeling no better off than had they not reported the incident at all.

121.   Even if Uber does respond to a report of rape or sexual assault, the response largely follows the same script focusing on "apologizing for the situation," an 'investigation,' and safety. Uber, at the direction of Uber's officers, directors and/or managing agents often does not tell the reporting victim what steps Uber takes in its 'investigation,' does not tell the victim if there have been other reports of sexual assault and/or rape made against this driver, and does not tell the reporting victim what the conclusion of the 'investigation' is. Nor does Uber urge victims to report the incident to law enforcement.

122.   On information and belief, Uber's 'investigations' into reports of rape and sexual assault amount to nothing more than following up with the rider and the driver and checking to see if the driver has any previous complaints against him.

123.   The results of these 'investigations' are not shared with the reporting victim, law enforcement, or other ridesharing companies, which would not only aid in actual law enforcement investigations, but would ensure that drivers with a history of rape and sexual assault are not allowed to continue driving and assaulting additional future victims.

### UBER'S SAFETY MEASURES CONTINUE TO BE INADEQUATE TO PROTECT AGAINST SEXUAL ASSAULT AND RAPE IN THEIR VEHICLES

124.   Uber's newly enacted safety measures continue to fall short of protecting female passengers from being raped or sexually assaulted by Uber drivers.

125.   In response to bad publicity Uber has received regarding sexual assaults and rapes that take place as a result of the Uber App, Uber, at the direction of Uber's officers, directors and/or

managing agents, enacted some changes and safety measures that could and should have been implemented long ago.

126.     Most of these changes to the Uber App are meaningless and serve merely as simple window dressing for press releases.  For example, one of the changes included the addition of an in-app emergency button that a woman in distress could use to call 911.  This however presupposes that a woman, in the midst of being sexually assaulted is: (1) conscious; (2) cognizant enough to know to use the emergency button; and (3) has access to her phone to make use of the feature.  Such a button does little to increase a passenger's safety, as a passenger could just as easily dial 911 on their cell phone as utilize an in-app emergency button.  Additionally, this feature does nothing to prevent the assault from occurring in the first place.

127.     Uber's officers, directors and/or managing agents have still refused to implement biometric fingerprint or Live Scan background checks.

128.     Uber's officers, directors and/or managing agents have still refused to implement in-app surveillance cameras to record Uber rides and ensure customer safety.

129.     Uber's officers, directors and/or managing agents have still refused to intervene when a ride goes off course or ends before the destination is reached.

130.     Uber, including Uber's officers, directors and/or managing agents, understands that these recent changes in the name of safety inadequate with respect to preventing occurrences of sexual assault in the first place.

## UBER FAILS TO PARTICIPATE IN TRANSPORTATION NETWORK COMPANY SAFETY HEARINGS

131.     On October 16, 2019 at 10:00 AM, the Subcommittee on Highways and Transit of the United States House of Representatives Committee on Transportation and Infrastructure held a hearing entitled "Examining the Future of Transportation Network Companies: Challenges and Opportunities" ("the Hearing").

132.     The aim of the Hearing was to discuss safety challenges and opportunities to protect both rideshare passengers and drivers across the country as well as to discuss legislation that has been proposed

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

to achieve greater safety and regulations of Transportation Network Companies (TNCs).

133.    The Subcommittee on Highways and Transit invited both Uber and Lyft to participate in the Hearing in order to answer the Subcommittee's questions and provide the TNC perspective on safety and regulations.

134.    Despite the obvious intent of the Subcommittee to increase the safety of rideshare for its passengers and customers, Uber refused to meet before the subcommittee.   As a result, the Subcommittee's questions were left unanswered.  Uber refused to appear because passenger and customer safety is not, and has never been, a priority or concern for Uber.

135.    On October 17, 2019, the Subcommittee sent to Uber CEO Dara Khosrowshahi a list of questions that went unanswered and requested Uber respond, in writing, to become part of the record of the Hearing.  Many of the questions posed to Uber were regarding Uber's position of the safety of their passengers:

October 17, 2019

Dara Khosrowshahi
Chief Executive Officer
Uber
1455 Market Street # 400
San Francisco, CA 94103

Dear Mr. Khosrowshahi:

On October 16, the Subcommittee on Highways and Transit held a hearing titled "Examining the Future of Transportation Network Companies: Challenges and Opportunities." Because you declined the invitation to participate in this hearing, some of the Subcommittee's questions went unaddressed.

Please find attached a list of questions to answer for the hearing record. The Subcommittee requests your written response to the questions no later than Friday, November 1 so that they may be made a part of the record. Failure to respond to these questions could result in a more substantive document request from the Committee.

If you or your staff have any questions or need further information, please contact ███████ of the Subcommittee on Highways and Transit at ████████████████████ or ████████

Sincerely,

PETER A. DeFAZIO
Chair

ELEANOR HOLMES NORTON
Chair
Subcommittee on Highways & Transit

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

4. Do you support making the number of reported crimes perpetrated by drivers against passengers you have received publicly available?

5. Do you support local authorities tracking incidents that occur on hailed rides in order to provide law enforcement with better data to inform their public safety strategies?

6. Do you track the type and frequency of passenger-reported crimes perpetrated by drivers you receive? If not, please explain why.

7. Please provide data on the total number of incidents involving alleged crimes against riders by drivers you have received, to date, broken down by type.

8. What is your specific process for reviewing alleged incidents of violence, assault, or harassment reported by Uber passengers? What is your specific process for reviewing complaints and alleged incidents by Uber drivers? What is your specific protocol for when and how to refer incidents to law enforcement?

9. What is your specific protocol to follow up with drivers who have been accused of harassment, assault, or violence? What is your specific protocol to deactivate a driver?

(Oct. 17, 2019 Subcommittee on Highways and Transit Letter to Dara Khosrowshahi)

**UBER'S 2017-2018 US SAFETY REPORT**

136.    On or about On December 5, 2019, Uber published a 2017-2018 US Safety Report which identifies 5,981 instances of sexual assault that were reported to Uber as having occurred during an Uber ride.

Table 12: 5 categories of sexual assault[172] (2017-2018)[173]

| Subcategory | 2017-2018 Frequency of incident reports (by # of trips) | 2017 # of incident reports | 2017 % of total trips[174] | 2018 # of incident reports | 2018 % of total trips | YoY incident rate change % change incident rate[175] |
|---|---|---|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 2,000,000 | 570 | 0.00006% | 594 | 0.00005% | -16% |
| Attempted Non-Consensual Sexual Penetration | ~1 in 4,000,000 | 307 | 0.00003% | 280 | 0.00002% | -26% |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 800,000 | 1,440 | 0.0001% | 1,560 | 0.0001% | -12% |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 3,000,000 | 390 | 0.00004% | 376 | 0.00003% | -22% |
| Non-Consensual Sexual Penetration | ~1 in 5,000,000 | 229 | 0.00002% | 235 | 0.00002% | -17% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

137.    The numbers, as reported above by Uber, mean that approximately 250 sexual assaults

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

per month are occurring as a direct result of the Uber App. These sexual assaults include rape, digital penetration, kidnapping, and other forms of physical brutality as well as verbal harassment and intimidation.

138.    Additionally, as Uber states in the 2017-2018 US Safety report, and as Uber, including Uber's officers, directors and/or managing agents, are aware, statistically 3 out of 4 sexual assaults go unreported by the victim. Against the backdrop of the underreporting of sexual assaults generally, the numbers of women that have reported being assaulted to Uber and to law enforcement are staggering.

139.    While UBER's 2017-2018 Safety Report is one small step in the right direction, the steps being taken by Uber in the name of passenger safety from sexual assault continue to be inadequate with regard to seriously addressing the problem.

140.    In the 2017-2018 US Safety Report, Uber attempts to downplay the staggering numbers of rape and sexual assault that occur on Uber rides by Uber drivers. Uber attempts to downplay the occurrences of sexual assault on the Uber platform by intimating that sexual assault is a problem in society generally, and that Uber is merely a reflection of society.

141.    Uber's approach to the number of sexual assaults reported to them by Uber customers entirely ignores the fact that the assaults experienced by Uber passengers at the hands of Uber drivers are completely enabled and facilitated by Uber and the Uber App.

142.    Despite Uber, including Uber's officers, directors and/or managing agents, knowledge of the assaults and the profound and ruinous effect on women's lives, they have failed for many years to take the steps which would prevent Uber's female customers from being sexually assaulted and raped. As a result, Uber is fostering and endorsing the sexual violence of its drivers.

### UBER'S TOXIC MALE CULTURE AND DISREGARD FOR WOMEN'S SAFETY

143.    Uber is a transportation company. Uber gives rides to people for a fee, hiring drivers to provide these rides to Uber's passengers by splitting the fee with the drivers.

144.    But getting into a car with someone you don't know is risky. Uber should have been aware of this risk from the beginning, in or about 2012, and it should have taken steps from the beginning to eliminate these risks. To the extent Uber's managing agents weren't aware of these risks at Uber's

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

inception, they quickly became aware when passengers and law enforcement started complaining to Uber that Uber drivers were sexually assaulting female Uber passengers. Yet despite this knowledge, Uber did nothing to help make rides safer for women. Instead, it misled its customers.

145.    In 2014, to make Uber seem less risky, Uber's managing agents started charging Uber passengers an extra $1 fee for each trip. Uber called this a *Safe Rides Fee*. When Uber announced the Safe Rides Fee, it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[5] The Safe Rides Fee wasn't split with drivers.[6] So it was pure revenue for Uber. Uber gave hundreds of millions of rides with the Safe Ride Fee attached to them, and made hundreds of millions in revenue from the fee.[7] But it never earmarked the money for improving safety or spent it on safety.[8] Instead, it pocketed the money it told the world it was putting toward safety. As a former Uber employee said "[w]e boosted our margins saying our rides were safer."[9] It "was obscene."[10] The idea for the Safe Rides Fee was crafted by an Uber managing agent. Discovery will reveal the identity of this managing agent.

146.    Rider safety was never Uber's concern. Growth was. One of its founders, Travis Kalanick, became Uber's second Chief Executive Officer and, at one time, its largest shareholder. Mr. Kalanick is a former officer, director, and managing agent of Uber. To increase growth, which required not only new riders, but new drivers, Travis Kalanick and the managing agents at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.[11] Uber hired Hirease, Inc. to do its background checks.[12] Hirease brags that it can vet drivers within 36 hours.[13] To have such a short turnaround, Uber eschewed industry

---

[5] Uber, *What is the Safe Rides Fee*, https://web.archive.org/web/20140420053019/http://support.Uber.com/hc/en-us/articles/201950566. (last visited October 6, 2019).
[6] MIKE ISAAC, SUPER PUMPED: THE BATTLE FOR UBER 136 (2019) ("The drivers, of course, got no share of the extra buck.").
[7] *See id*.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Isaac, *supra* note 5, at 115 ("Uber made it as easy as possible for drivers to sign up.").
[12] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, N.Y. TIMES, Dec. 9, 2014, at A1 (available at https://www.nytimes.com/2014/12/10/technology/Ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1)
[13] *Id*.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

standards used by other taxi companies and livery services. For example, it refused to use fingerprinting — which takes weeks — and running applicant drivers against private databases, such as FBI records.[14] These shortcuts might have led to growth for Uber, but they also put people, including Plaintiff, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could begin driving, before Uber's cursory background check was even complete.[15]

147.    Travis Kalanick made the decision that Uber was going to not fingerprint its drivers, that it was not going to scrub these drivers against FBI records, and that it was going to use a fast and shallow background-check process. He had actual knowledge that these acts would put passengers in greater danger. As such, he acted with conscious disregard to the rights and safety of female passengers, including Plaintiff. Travis Kalanick intentionally performed the act of hiring drivers without fingerprinting them, of not scrubbing drivers against FBI databases, and using fast and shallow background checks. When he took these actions, he knew or should have known that it was highly probable that harm would result.

148.    Still today — despite its knowledge that so many women have been sexually assaulted by Uber drivers during Uber Rides — Uber does not fingerprint its drivers, and it does not do thorough background checks.

149.    Uber's complete disregard for rider safety or the rule of law is breathtaking. Uber's policy is that it won't report any criminal activity it learns of to law-enforcement authorities.[16] That includes allegations of sexual assault.[17] So Uber's policy is that if it learns from an Uber rider, such as Plaintiff, that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.[18] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the police on behalf of customers when an Uber driver rapes an Uber passenger.[19] This policy has been supported by Uber's current Chief Executive Officer Dara Khosrowshahi. When he took the action of intentionally embracing this policy, he knew or should have known that it was highly probable that harm would result. After all,

---

[14] *Id.*
[15] Isaac, *supra* note 5, at 218.
[16] *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASH. POST (Oct. 1, 2019) (available at https://www.washingtonpost.com/podcasts/post-reports/Uber-says-safety-is-its-first-priority-employees-arent-so-sure/.)
[17] *Id.*
[18] *Id.*
[19] *Id.*

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

drivers are more likely to commit sexual assault if they know it is less likely that law enforcement will be informed of the assault.

150.    Uber's narrow focus on growth and profits over safety and this misogynistic culture has had tragic consequences for Uber passengers. In December 2014, a 26-year-old finance worker hailed an Uber to take her home from a work dinner near New Delhi, India.[20] When she fell asleep in the car, her Uber driver moved to the backseat and raped her.[21] The driver had previously been detained for rape.[22] The rape caused an international imbroglio, and New Delhi temporary banned Uber.[23] Uber dealt with the situation by attacking the victim.

151.    Eric Alexander was president of Uber in the Asia–Pacific region; he was Uber's "number three," Kalanick's fixer, and a managing agent of Uber.[24] He secured, possibly illegally, the New Delhi rape victim's medical records through a law firm.[25] The records contained the medical examination that doctors performed within hours of her rape.[26] Alexander shared these records with Mr. Kalanick and Uber's number two at the time, Emil Michael, a managing agent at Uber.[27] Many other Uber managing agents either saw the records or learned of them.[28] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[29] (This despite two people pointing out to him that the victim could have been anally raped.[30]) He began cultivating and sharing a bizarre conspiracy that the woman wasn't raped; the whole incident was a plot against Uber by Olga, Uber's major ride-sharing competitor in India.[31] Uber ignored the fact that the Uber driver had a history of sexual assault and had actually confessed the assault to police.[32]

---

[20] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, N.Y. TIMES, Dec. 8, 2014, at A4 (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-Uber-after-driver-is-accused-of-rape.html?_r=0&module=inline.); Isaac, *supra* note 2, at 149.

[21] Isaac, *supra* note 5, at 149.

[22] Barry and Raj, *supra* note 19.

[23] *See id.*

[24] Isaac, *supra* note 5, at 260.

[25] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017), https://www.vox.com/2017/6/7/15754316/Uber-executive-india-assault-rape-medical-records.

[26] Isaac, *supra* note 5, at 261.

[27] Swisher and Bhuiyan, *supra* note 24.

[28] *Id.*

[29] Isaac, *supra* note 5, at 261.

[30] *Id.* at 262.

[31] *Id.* at 261; Swisher and Bhuiyan, *supra* note 24.

[32] Barry and Raj, *supra* note 19.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

152.    Mr. Kalanick and Uber's managing agents and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[33] When Uber customers accused Uber drivers of sexual assault, something that happened with increasing frequency as Uber grew — given its lax supervision and shoddy background checks — Mr. Kalanick would pace around Uber headquarters, not considering how to make Uber's safer for women, but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."[34] When a sexual-assault victim decided not to endure the hardship of bringing a civil claim against Uber, or law enforcement decided the evidence was too inconclusive to bring criminal charges, "a round of cheers would ring out across the fifth floor of Uber HQ,"[35] as Uber's managing agents celebrated.

153.    This culture spread throughout Uber. One female Uber employee in Malaysia left work one night and noticed a gang was following her.[36] She was worried someone would rape her and started texting her fears to her boss at Uber.[37] He wrote back, "Don't worry, Uber has great health care. We will pay for your medical bills."[38]

154.    In Thailand, as they had done before, one night a group of Uber employees were up late at the Uber office snorting cocaine and drinking.[39] A female employee decided she didn't want to do drugs.[40] Her Uber manager grabbed her head and shoved it into a mound of cocaine, forcing her to snort it.[41]

155.    One night in South Korea, Mr. Kalanick and Mr. Michael took a female Uber employee and some South Korean Uber employees to a brothel where they sang karaoke.[42] Almost immediately upon arriving, the female Uber employee left, visibly shaken.[43] Although Mr. Kalanick and Mr. Michael left after singing Sweet Child O' Mine, the South Korean Uber employees stayed at the bar with the escorts they had picked out.[44] Mr. Kalanick, Mr. Michael, and the others expensed the night at the brothel

---

[33] Isaac, *supra* note 5, at 194 ("The tone of Uber's culture was being set from the top. . . . The result was a workforce that largely reflected Kalanick.").
[34] Isaac, *supra* note 5, at 167.
[35] *Id.*
[36] Isaac, *supra* note 5, at 195.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] Isaac, *supra* note 5, at 195.
[42] Isaac, *supra* note 5, at 250–51.
[43] Isaac, *supra* note 5, at 251.
[44] *Id.*

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

to Uber's corporate account.[45]

156.    Uber employees and managing agents started regularly throwing parties at topless bars, often expensing the trips to Uber's corporate account.[46] They called it "Tits on Travis" Kalanick.[47]

157.    At a cocktail and dinner party with journalists in New York City, Mr. Michael attacked journalists who criticized Uber.[48] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny" and had said she was going to delete her Uber App because she feared for her safety because of Uber's drivers.[49] Mr. Michael said that if any woman deleted her Uber app because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[50] He also floated the idea that Uber could spend a million dollars paying journalists and investigators to dig up dirt on journalists who wrote ill of Uber.[51] He then attempted to shame Ms. Lacy by suggesting that his hack journalists and investigators could find lots of dirt regarding Ms. Lacy and her romantic relationship with her partner.[52] He said Uber could get away with this because "[n]o body would know it was us."[53]

158.    The actions of Uber's executives and board members demonstrate both Uber's contempt for women and profit driver myopia. Uber only cares about growth. This culture oozes throughout the company and endangers Uber's female riders. Sarah Fowler wrote an explosive blog post, describing how pervasive this culture was at Uber.[54] Ms. Fowler was hired by Uber as a site-reliability engineer in 2015.[55] On her first day on the job, post-training, her manager sent her a message over the Uber chat system.[56] He said that he "was in an open relationship . . . and his girlfriend was having an easy time finding new partners but he wasn't. He was trying to stay out of trouble at work, he said, but he couldn't help getting

[45] Isaac, *supra* note 5, at 194.
[46] Isaac, *supra* note 5, at 194.
[47] *Id.*
[48] Ben Smith, *Uber Executive Suggests Digging Up Dirt On Journalists*, Buzz Feed (Nov. 17, 2014) https://www.buzzfeednews.com/article/bensmith/Uber-executive-suggests-digging-up-dirt-on-journalists.
[49] *Id.*
[50] *Id.*; Isaac, *supra* note 5, at 129.
[51] Smith, *supra* note 47.
[52] *Id.*; Isaac *supra* note 5, at 129.
[53] Smith, *supra* note 47.
[54] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber*, Susan J. Fowler, (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-Uber.
[55] *Id.*
[56] *Id.*

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

in trouble, because he was looking for women to have sex with."[57] Ms. Fowler felt it "was clear that he was trying to get [her] to have sex with him, and it was so clearly out of line that [she] immediately took screenshots of [the] chat messages and reported him to" Human Resources.[58] Uber Human Resources and "upper management" told her that "even though this was clearly sexual harassment and he was propositioning [her], it was this man's first offense, and that they wouldn't feel comfortable giving him anything other than a warning and a stern talking-to."[59] Upper management told her that her manager "was a high performer," so "they wouldn't feel comfortable punishing him for what was probably just an innocent mistake on his part."[60] Upper management told Ms. Fowler that she had two choices, join a new Uber team, or stay on her team, under the manager who propositioned her, but she "would have to understand that [the manager] would most likely give [her] a poor performance review when review time came around, and there was nothing [Human Resources] could do about that."[61] She was told by Human Resources that if she chose to stick with the team she was on, that a poor review by her then manger wouldn't be retaliation because she had "been given an option"[62] to switch teams. Because working under a harassing manager was untenable to Ms. Fowler, she chose to switch teams.[63] She eventually learned, by talking to other female employees at Uber, that many of them had similar sexual-harassment stories and that the manager who sexually harassed her had sexually harassed others before he sexually harassed her.[64] That is, she learned that Human Resources and Uber's managing agents had been mendacious with her. "Within a few months, [the harasser] was reported once again for inappropriate behavior, and those who reported him were told it was still his 'first offense.' The situation was escalated as far up the chain as it could be escalated, and still nothing was done" by Uber.[65] But Uber's misogyny spread beyond aiding and abetting sexual harassment. Uber bought leather jackets for some of its site-reliability engineers.[66] Male engineers were given free jackets, female engineers had to pay for them.[67] When Ms.

---

[57] *Id.*
[58] *Id.*
[59] Fowler, *supra* note 53.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] Fowler, *supra* note 53.
[65] *Id.*
[66] *Id.*
[67] *Id.*

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

Fowler complained, the director of engineering told her that if "women really wanted equality, then [they] should realize [they] were getting equality by not getting the [free] leather jackets. He said that because there were so many men in the org, they had gotten a significant discount on the men's jackets but not on the women's jackets, and it wouldn't be equal or fair . . . to give the women leather jackets that cost a little more than the men's jackets."[68]

159. With the bad press Uber was getting because of the sexual assaults, Mr. Michael's comments, and the Sarah Fowler affair, Uber realized it needed to appear that it was making changes and appear to be trying to eradicate its toxic-male culture, so it held a company-wide meeting to announce changes. At the meeting, when Uber announced that it was going to increase its diversity and sensitivity by adding a female board member, David Bonderman, another Uber board member, chimed in, announcing to the company that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[69] Uber's "culture was poisoned from the very top."[70] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women, like Plaintiff.

160. To further try to repair its tattered reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[71]

161. During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[72]

162. Uber's sexual-assault and -harassment problems have become so big and so public that led Uber to pretend to act as though it was really trying to confront them. In May 2018, Uber acknowledged

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

---

[68] *Id.*
[69] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, N.Y. TIMES, June 13, 2017, at A16 (available at https://www.nytimes.com/2017/06/13/technology/Uber-sexual-harassment-huffington-bonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-heading&module=inline&region=top-news&WT.nav=top-news); Isaac, *supra* note 2, at 277.
[70] Isaac, *supra* note 5, at 280.
[71] Covington & Burling, LLP, *Covington Recommendations* (available at https://drive.google.com/file/d/0B1s08BdVqCgrUVM4UHBpTGROLXM/view.)
[72] Isaac, *supra* note 5, at 271.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

its "deeply rooted problem" of sexual assault. It proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[73] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[74]

163.    One change Uber did not make was warning passengers that Uber is a risky method of transportation for women because of the high number of women who are sexually assaulted by Uber drivers during Uber Rides. Uber, unlike the public, knew the risk to female Uber passengers because of all the complaints about Uber drivers that Uber received. But Uber does not and has never provided a warning about the high incident of sexual assaults that occur on the Uber platform to users of the Uber App.

164.    When Uber finally released the safety report, it was forced to acknowledge that in 2018 alone there were 3,045 sexual assaults in the United States during Uber trips — 235 sexual assaults of the "most serious kind."

165.    But Uber became aware of its sexual assault problem long before it released the Holder Report. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[75]

166.    Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[76] As described earlier, these decisions to lower the bar were made by Travis Kalanick and other officers, directors, and managing agents. And these decisions to so lower the bar were made with actual knowledge, on the part of Uber's managing agents, that Uber passengers were being sexually assaulted at an alarming rate.

167.    But it wasn't that Uber simply lowered the bar. It failed to take adequate steps to make its rides safe; it failed to provide everything necessary for safe transportation of its passengers. For example, Uber failed to install video cameras in the cars. Such a step would have deterred many potential predators. It failed to provide an option in the Uber App that allowed female riders to select to be driven by female

---

[73] Uber, *Turning the Lights On*, https://www.Uber.com/newsroom/turning-the-lights-on/.
[74] *Id.*
[75] Issac, *supra* note 5 at 166,
[76] *Id.* at 177.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies and the failure to take adequate safety precautions were put in place by Travis Kalanick and other officers, directors, and managing agents of Uber. The policy of refusing to warn passengers about the sexual assault risks was made by Mr. Kalanick, Mr. Khosrowshahi, and the other officers, directors, and managing agents. These managing agents at Uber knew that if they required cameras in Uber cars fewer sexual assaults during Uber rides would occur. They knew that if they provided the option for females so that women could select to be driven by females, fewer sexual assaults during Uber rides would occur. They knew that if they better trained their drivers in sexual-assault prevention, fewer sexual assaults would occur during Uber rides. They intentionally refused to put these safety policies in place with actual and constructive knowledge that not putting these policies in place made it highly probable that harm to female Uber passengers would result.

168.    As Uber became more popular, potential drivers realized that Uber had so lowered that bar that people with checkered backgrounds could drive for Uber. They began to realize that Uber hadn't implemented adequate safety precautions that might make it more difficult to get away with sexual assaults, like requiring video cameras in cars. And potential drivers began to Uber was protecting drivers who had been accused of sexual assault by not reporting those assaults to law enforcement. They also realized that Uber was marketing itself to women as a safe mode of transportation, including after drinking. Because of these factors, Uber became a magnet for sexual predators — men who knew that driving for Uber meant they would get to drive around intoxicated women late at night. These men started sexually assaulting women at alarming rates, as the Holder Report shows. And, as stated earlier, Uber and its officers, directors, and managing agents — including Travis Kalanick — had actual knowledge that these sexual assaults were going on because the victims of these assaults were reporting them to Uber. But Uber's officers, directors, and managing agents did nothing. They failed to start screening drivers adequately, or to require video cameras in cars. They failed to give Plaintiff an adequate warning about the risks of driving in an Uber as a woman. Uber's managing agents intentionally refused to take these safety measures and precautions with actual knowledge of the problem, and these officers directors, and managing agents — including Travis Kalanick — had actual or constructive knowledge that refusing

Levin Simes LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

to implement these safety measures meant that there was a high probability that more harm would result to female passengers, including Plaintiff.

169.    In short, before Plaintiff was sexually assaulted, Uber's officers, directors, and managing agents — including Travis Kalanick — knew, that female passengers were frequently being sexually assaulted by Uber drivers. Uber's officers, directors, and managing agents also knew that Uber hadn't taken all the safety measures it could have or should have taken and that because of Uber's failure to do so, more women were likely to be sexually assaulted during Uber rides. In this way, Uber's officers, directors, and managing agents acted with conscious disregard to the safety of future female passengers, including Plaintiff.

170.    Moreover, Uber, because its passengers were complaining directly to Uber about being sexually assaulted during Uber rides, Uber knew it had a sexual assault problem. But Uber failed to warn its passengers as to what was going on. Uber is an unsafe mode of transportation for women who are riding alone, and Uber knew this to be so. But it did not provide its passengers with any warning of how unsafe Uber is for women. In fact, it concealed this fact from the public — a fact its female passengers and the public were unaware of. If Uber would have warned women that Uber was unsafe for women, fewer women would have been sexually assaulted.

## PLAINTIFF'S INJURY

171.    On or around January 18, 2020, Plaintiff Jane Doe LS 348's ("Doe 348") friend requested an Uber through the Uber app to take them safely to their destinations. Plaintiff's friend was dropped off first. When the Uber driver arrived at Plaintiff's destination, he followed Plaintiff into her home, raped her, and stole money from her wallet.

172.    This depraved and disgusting attack frightened, humiliated, degraded, violated, and robbed Plaintiff Doe LS 348 of her dignity and personal safety.

173.    By failing to take reasonable steps to confront the problem of multiple rapes and sexual assaults of Uber passengers by Uber drivers, Uber has acted in conscious disregard of the safety of its passengers, including Doe 348, has breached its duty of reasonable care, and has breached the implied and express covenants arising from its contract with its passengers.

174.    The Uber driver who perpetrated the above-described assault, sexual assault, and/or

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

attack on Doe 348 in the course and scope of his employment with Uber and while he was still under Uber's direction and control. These acts caused Plaintiff pain and suffering that persists to this day.

175.    The Uber driver was acting on behalf of, for the benefit of, at the direction of, and within the course and scope of employment with Uber and engagement by Uber. Uber provided the Uber driver with access to its ride-sharing app platform, a tool necessary for Uber drivers to perform the work Uber assigned. Uber, through the Uber App, directed the Uber driver regarding the location of the pickup, time of the pickup, and routes for both the pickup of Plaintiff and transportation to her destination, and much more, as discussed below.

176.    The Uber driver who assaulted Doe 348 was an agent or employee of Uber, which is a common carrier. His duties were directed at the comfort and protection of passengers in his car, including Jane Doe LS 348.

177.    Uber derived a monetary benefit from every ride assigned to said Uber driver through its app, including the Plaintiff's ride where she was sexually assaulted, sexually battered, sexually harassed, raped, falsely imprisoned, and/or otherwise attacked.

## CAUSES OF ACTION
## COUNT ONE – GENERAL NEGLIGENCE

178.    The preceding paragraphs of this Complaint are incorporated by reference.

179.    By providing transportation to the general public using its application and network of drivers, and by charging its passenger Uber owed a duty to act with due and reasonable care towards both the public and towards its own passengers, including Plaintiff.

180.    Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, and raping its passengers since at least 2014.  Uber was aware or should have been aware that some significant subset of Uber drivers would continue to sexually assault, harass, physically assault, rape, and/or otherwise attack their vulnerable Uber patrons and passengers.

181.    Since learning of the sexual assaults perpetrated by its drivers, Uber never adopted appropriate safety measures and failed to improve its limiting existing safety procedures in any meaningful way.

182.    Uber does not require video monitoring of its drivers, nor does it provide emergency notification to Uber and the authorities when a driver drastically veers off

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended

destination but GPS data indicates the passenger remains in the car for a significant period of time.

183.    At all times relevant, Uber was well aware of the dangers its drivers posed to its passengers, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation.  In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver.

184.    At the time Plaintiff was sexually assaulted, Uber did not require sexual harassment/assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

185.    Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers.  Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will even consider law enforcement requests for information.  Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information.  Uber's policy of noncooperation discourages police agencies from making recommendations to District Attorneys' offices to file complaints against Uber drivers and provides Uber's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

186.    When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks which would provide the most comprehensive means of screening applicant drivers.  Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

187.    Uber does not have a consistent, reliable system for addressing passenger reports of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

188.    Uber did not interview, check the references of, provide training to, or advise the Uber drivers of any anti-sexual assault policies when hiring them.  Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use

reasonable care in determining whether each driver was fit for the task. Uber should have known of the unfitness of the Uber driver involved in the assault described herein but failed to use reasonable care to discover their unfitness and incompetence.

189. Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, for transporting vulnerable and or intoxicated women late at night in a moving vehicle, Uber hired said drivers to do exactly that.

190. Uber knew or should have known that assigning the task of transporting vulnerable passengers late at night to an inadequately screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

191. Uber failed to employ measures to adequately supervise its drivers.

192. Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

193. Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

194. The Uber driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which they were hired as they improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to their destinations, thereby causing psychological and or physical harm.

195. Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was sexually assaulted, harassed, sexually battered, raped, falsely imprisoned, and/or otherwise attacked which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

196. Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

197. In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of driver's criminal conduct while acting within their capacity as Uber drivers, and has been the subject of

Levin Simes LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

numerous civil suits alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

198.   Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of sexual assault, harassment, kidnapping, physical assault, rape, and/other attacks by Uber drivers.  In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being sexually assaulted.

199.   Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from sexual assault.

200.   Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports to Uber she was sexually assaulted.

201.   Uber had reason to know that passengers would be unaware of the risk of sexual assault by Uber drivers.

202.   A warning to its passengers that they were at risk of sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assault they suffered at the hands of Uber driver.

203.   Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver.

204.   In doing those things alleged herein above, Defendant Uber acted negligently, carelessly, and recklessly, resulting in serious injury to Plaintiff.

205.   In doing those things alleged herein above, Uber breached its duty of reasonable care to Plaintiff.

206.   As a legal and direct result of Uber's aforementioned conduct and omissions, Plaintiff was sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fox

attacked by an Uber Driver, which humiliated, degraded, violated, and robbed Plaintiff of their dignity and personal safety. The assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

207.    As a direct and legal result of Uber's general negligence, Plaintiff suffered damages, both economic and general, non-economic damages, according to proof.

## COUNT TWO – COMMON CARRIER NEGLIGENCE

208.    The preceding paragraphs of this Complaint are incorporated by reference.

209.    At the time Plaintiff was sexually assaulted, sexually battered, harassed, kidnapped, falsely imprisoned, physically assaulted, raped, or otherwise attacked Uber was a common carrier as it provided transportation to the general public.

210.    Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users, the passengers, from place to place for profit.  Uber has widely offered its services to the general public and charges standard fees for its services through its application.  Uber does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation.  Any member of the public can use Uber's services for transportation.

211.    As a common carrier, Uber must carry its passengers, including Plaintiff, safely.

212.    Uber has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company.  Uber has a duty to do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

213.    Uber must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

214.    Despite complaints to Uber of sexual assaults committed by Uber drivers and lawsuits against Uber for sexual assault, Uber has failed to implement safety precautions that would adequately address its sexual assault problem.

215.    Uber does not provide a consistent and reliable way for passengers to report sexual abuse and rape.

216.    Uber does not warn passengers of the dangers of riding with Uber and fails to warn

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

passengers of past complaints regarding Uber drivers.

217.    Uber does not have an effective program in place to deal with the sexual predator crisis posed by some of its drivers.

218.    Uber knows its female passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its drivers are sexual predators.

219.    Uber has not exercised reasonable care to protect its passengers from harassment, assault, and rape by Uber's drivers.

220.    Uber has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Uber.  If Uber had used the highest degree of care, Uber could have prevented or dramatically reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

221.    Uber failed to safely transport Plaintiff.

222.    Uber failed to use the utmost care and vigilance to protect Plaintiff from its own drivers who sexually assaulted, stalked, harassed, physically assaulted, raped, and/or otherwise attacked Plaintiff while they were being transported by Uber.

223.    Uber failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of sexual assaults, harassment, kidnapping, physical assaults, rapes and/or other attacks by its drivers which humiliated, degraded violated, and robbed Plaintiff of her dignity and personal safety.  The assault on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

224.    As a legal and direct result of the aforementioned conduct and omissions of Uber, Plaintiff was sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of their dignity and personal safety. The attack on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover.

225.    As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

damages, both economic and general, non-economic damages according to proof.

## COUNT THREE – NEGLIGENT MISREPRESENTATION

226.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

227.    Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable.  At the time of the assault alleged, Uber knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually molesting, assaulting, and/or raping them.

228.    Uber continued to represent that its services were safe to further Uber's own pecuniary interests.

229.    In representing to its customers/users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

230.    Uber knew or should have known that it could not provide the safe ride that it represented it could.

231.    Knowing of the incidence of sexual assault, harassment, kidnapping, physical assault, rape, and/or other attacks of its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride home as represented.

232.    In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get them safely to their intended destination.

233.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by an Uber employee, an Uber driver, who sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked Plaintiff.

234.    As a legal result of Uber's aforementioned conduct, Plaintiff was sexually assaulted, harassed, sexually battered, raped, falsely imprisoned, stalked, and/or otherwise attacked by their Uber driver, which humiliated, degraded, violated, and robbed them of their dignity and personal safety.  The depraved attack on Plaintiff caused her to suffer both physical and psychological harm from which she may never fully recover.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

235.    As a legal result of Uber's negligent misrepresentations, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT FOUR – INTENTIONAL MISREPRESENTATION

236.    The preceding paragraphs of this Complaint are incorporated by reference.

237.    At the time Plaintiff was sexually assaulted, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked, Plaintiff had downloaded the Uber application and had an account with Uber.

238.    Defendant Uber represented to Plaintiff that it was true that the Uber App was safe to use and that Plaintiff would be safely taking Uber rides with drivers whose backgrounds had been properly screened by Uber, and that Uber would provide a safe experience.

239.    Defendant Uber's representation was false.  Uber had not properly screened its drivers in a meaningful way and their drivers posed a grave threat to Plaintiff's safety and wellbeing, and Uber did not provide Plaintiff with a safe experience.

240.    Defendant Uber knew that its representations made about safety were false when the statements were made, or at a minimum, made the representations recklessly and without regard for their truth.

241.    Uber made these representations to Plaintiff and the general public despite knowing that it had chosen not to take the measure necessary to provide a safe ride home, and that as a result, continued sexual assault, harassment, kidnapping, physical assault, rape, and/or other attacks of its passengers by its drivers was a foreseeable occurrence. Uber made these representations in order to induce individuals like the Plaintiff into using Uber's services and to derive profit for individuals like Plaintiff.

242.    Defendant Uber intended that Plaintiff rely on the representations about safety.  In fact, Uber made these misrepresentations with the intent to cause Plaintiff to rely on this false information to induce Plaintiff to utilize Uber's services in spite of any concerns Plaintiff might otherwise have about the safety of Uber's services.

243.    Plaintiff actually and reasonably relied on the representations made by Defendant Uber when they agreed to utilize Uber's services after being informed that Uber stringently screened its drivers and took measures to ensure it provided passengers safe transport.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

244.    In getting into the Uber ordered for Plaintiff, Plaintiff reasonably relied on Uber's representations that it would get them safely home.

245.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by Uber's employee Uber driver who sexually assaulted, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked Plaintiff.

246.    Plaintiff's reliance on Defendant Uber's representations was a substantial factor in causing the harm suffered by Plaintiff.

247.    As a legal result of Uber's intentional misrepresentation, Plaintiff was sexually assaulted, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked which humiliated, degraded, violated, and robbed Plaintiff of their dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

248.    As a legal result of Uber's intentional misrepresentation, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

## COUNT FIVE– VICARIOUS LIABILITY/LIABILITY FOR THE TORTS OF UBER DRIVERS

249.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

250.    Uber is vicariously liable for the torts of its drivers through the theories of *respondeat superior*, nondelegable duties, agency, and ostensible agency.  Uber's liability for the acts of its drivers is not contingent upon the classification of its drivers as employees.

251.    Under the doctrine of *respondeat superior*, Uber is responsible for the torts of its employees committed within the scope of employment.  The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiff.

252.    Uber profits from transporting vulnerable passengers late at night.  Uber encourages intoxicated passengers to use its services.  At the same time, Uber does not take reasonable steps to protect its passengers or warn them of the dangers of riding with Uber.  Uber should bear the costs of injuries that result from torts such as sexual assault, false imprisonment, and rape; not the victims of Uber's negligence, willful wrongdoing and intentional omissions made at the expense of passenger safety.

Levin Simes LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

253.    Uber drivers are employees and agents of Uber.  Uber reserves the right to control the activities of Uber drivers.  Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before he accepts a ride, and reserves the right to terminate drivers with or without cause.

254.    The sexual assault, sexual battery, rape, falsely imprisonment, stalking, harassment, and/or other attack Plaintiff suffered was perpetrated by the Uber Driver within the scope of their employment and authority.  The sexual assault and/or rape of intoxicated and unaccompanied women who have been placed in an improperly screened Uber driver's car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

255.    Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees or agents, Uber has a non-delegable duty to transport its passengers safely.

256.    The doctrine of nondelegable duty recognizes that for public policy reasons, certain duties cannot be delegated to a third party.   It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor in order to evade its own responsibilities.  This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors in order to further the employer's pecuniary interests.[77]

257.    In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated.  To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures.  Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

---

[77] See, for example, *Barry v. Raskov* (Ct. App. 1991) 232 Cal. App. 3d 447, 454, where the court recognized that allowing a broker to delegate the liability for the fraudulent torts of its contractor property appraiser would incentivize the broker to hire potentially insolvent contractors, to the detriment of the public.

258.    Further, Uber drivers act as agents of and operate as extensions of Uber.  Uber drivers represent Uber's business and further Uber's pecuniary interests.

259.    Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact.  Uber drivers provide the service that Uber claims to provide-- transportation.

260.    By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including Uber Driver, were Uber's employees and/or agents.

261.    Plaintiff reasonably believed that their Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of their contact with the driver.

262.    For these reasons and others, Uber is vicariously liable for the tortious acts of its drivers, regardless of whether Uber's drivers are employees, agents, apparent agents, or contractors of Uber.

263.    As a direct and legal result of the Uber driver's tortious conduct, Plaintiff was sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked which humiliated, degraded, violated, and robbed Plaintiff of their dignity and personal safety.  The depraved attack on Plaintiff caused Plaintiff to suffer both physical and or psychological harm from which she may never fully recover.

264.    As a direct and legal result of Uber Driver's tortious conduct for which Uber is legally liable, Plaintiff suffered economic and general, non-economic damages according to proof.

## COUNT SIX – VICARIOUS LIABILITY FOR FALSE IMPRISONMENT

265.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

266.    At the times Plaintiff was sexually assaulted, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked by their Uber driver, the Uber Driver involved intended to cause harmful and offensive contact with Plaintiff, and placed Plaintiff in a reasonable apprehension of imminent, harmful, and offensive contact. The Uber drivers involved in each assault intentionally and recklessly did acts which placed Plaintiff in apprehension of imminent harm, including being sexually assaulted, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked, which humiliated, degraded,

1  violated, and robbed Plaintiff of her dignity and personal safety.

2  267. These Uber drivers committed these tortious and wrongful acts while acting in the course

3  and scope of their employment with Uber as an employee/agent of Uber. Therefore, Uber is liable for

4  the Uber driver's sexual assault of Plaintiff and is responsible for damages caused by said conduct under

5  the principles of vicarious liability, including the doctrine of *respondeat superior*. Even if the Uber drivers

6  had not been employees, Uber's duty to provide transportation free of assault is nondelegable, and Uber

7  is liable for its drivers' actions, because to allow Uber to delegate its duty of providing the safe

8  transportation it promises would incentivize Uber to create a greater risk of harm to the public.

9  268. For these reasons and others, Uber is vicariously liable for the false imprisonment Plaintiff

10  suffered at the hands of their Uber driver.

11  269. As a direct and legal result of the Uber driver's false imprisonment, Plaintiff was

12  humiliated, degraded, violated, and robbed of their dignity and personal safety. The depraved attack on

13  Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully

14  recover.

15  270. As a direct and legal result of the Uber driver's false imprisonment of Plaintiff for which

16  Uber is vicariously liable, Plaintiff suffered economic and general, non-economic damages according to

17  proof.

18  271. Uber is vicariously liable for the torts of its drivers under the theory of *respondeat superior*,

19  the nondelegable duty doctrine, agency, and ostensible agency.

20  **COUNT SEVEN – VICARIOUS LIABILITY FOR SEXUAL ASSAULT**

21

22  272. Plaintiff hereby incorporates by reference the preceding causes of action and factual

23  allegations.

24  273. At the times Plaintiff was sexually assaulted, harassed, kidnapped, physically assaulted,

25  raped, and/or otherwise attacked by their Uber driver, the Uber Driver involved intended to cause harmful

26  and offensive contact with Plaintiff, and placed Plaintiff in a reasonable apprehension of imminent,

27  harmful, and offensive contact. The Uber drivers involved in each assault intentionally and recklessly did

28  acts which placed Plaintiff in apprehension of imminent harm, including being sexually assaulted,

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

274.    These Uber drivers committed these tortious and wrongful acts while acting in the course and scope of their employment with Uber as an employee/agent of Uber.  Therefore, Uber is liable for the Uber driver's sexual assault of Plaintiff and is responsible for damages caused by said conduct under the principles of vicarious liability, including the doctrine of *respondeat superior*.  Even if the Uber drivers had not been employees, Uber's duty to provide transportation free of assault is nondelegable, and Uber is liable for its drivers' actions, because to allow Uber to delegate its duty of providing the safe transportation it promises would incentivize Uber to create a greater risk of harm to the public.

275.    For these reasons and others, Uber is vicariously liable for the sexual assault Plaintiff suffered at the hands of their Uber driver.

276.    As a direct and legal result of the Uber driver's sexual assault, Plaintiff was humiliated, degraded, violated, and robbed of their dignity and personal safety.  The depraved attack on Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully recover.

277.    As a direct and legal result of the Uber driver's sexual assault for which Uber is vicariously liable, Plaintiff suffered economic and general, non-economic damages according to proof.

278.    Uber is vicariously liable for the torts of its drivers under the theory of *respondeat superior*, the nondelegable duty doctrine, agency, and ostensible agency.

### COUNT EIGHT – VICARIOUS LIABILITY FOR SEXUAL BATTERY

279.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

280.    Here, the Uber driver involved made harmful and offensive contact with the Plaintiff. Plaintiff did not consent to the contact.  Plaintiff was harmed and offended by the Uber driver's contact. The Uber driver intentionally and recklessly committed acts that resulted in harmful contact with the Plaintiff's person, including but not limited to sexual molestation and or penetration, touching of a sexual body part without consent, touching of Plaintiff in a sexual manner, forced kissing without consent, and or forcing Plaintiff to touch the drivers in a sexual manner.

281.    As a result of Uber Driver's sexual assault, sexual battery, harassment, kidnapping,

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

physical assault, rape, and/or other attack on Plaintiff which occurred while in the course and scope of Uber driver's employment, Plaintiff was sexually assaulted, sexually battered, harassed, kidnapped, physically assaulted, raped, and/or otherwise attacked which humiliated, degraded, violated, and robbed of their dignity and personal safety.  The depraved attack on Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully recover.

282.    As a legal result of the sexual battery committed by the Uber driver involved in each instance, and Uber's liability and vicarious liability for the same, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

283.    Uber is vicariously liable for the torts of its drivers under the theory of *respondeat superior*, the nondelegable duty doctrine, agency, and ostensible agency.

## COUNT NINE – STRICT PRODUCT LIABILITY – DESIGN DEFECT

284.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

285.    Uber manufactured and distributed the Uber App.

286.    The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

287.    The Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

288.    The Uber App did not include safety features such as a GPS tracking system that would alert Uber to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Uber vehicle after the driver ended the ride in the app.  It also did not include the automatic activation of the camera in drivers' smart phones when a ride is in progress. Those safety features would discourage driver assaults and have dissuaded the assault that occurred here.

289.    The Uber App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Uber.

290.    These flaws in the design of the Uber App, were a substantial factor in causing harm to the Plaintiff, which included being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by Uber Driver, which humiliated, degraded, violated, and robbed

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

Plaintiff of their dignity and personal safety.  The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which she may never fully recover.

291.    As a legal result of Uber's aforementioned acts and omissions, Plaintiff suffered damages, both economic and general, non-economic damages, according to proof.

### COUNT TEN – STRICT PRODUCT LIABILITY – FAILURE TO WARN

292.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

293.    Uber manufactured and distributed the Uber App.

294.    The Uber App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber App, could neither escape from the Uber driver's vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

295.    The potential risks presented a substantial danger when the Uber App was used or

296.    misused in an intended or reasonably foreseeable way.

297.    Ordinary consumers such as Plaintiff would not have recognized the potential risks.

298.    Defendant Uber failed to adequately warn consumers, including Plaintiff, of these potential risks.

299.    If the Uber App had adequate warnings, Plaintiff would have taken steps to protect herself, or not used Uber at all. Either would have prevented the injury that occurred here.

300.    Uber's failure to provide passengers, including Plaintiff, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiff, including being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver which humiliated, degraded, violated, and robbed Plaintiff of their dignity and personal safety.  The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which she may never fully recover.

301.    As a legal result of Uber's aforementioned acts and omissions, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax

## PUNITIVE DAMAGES

302.    Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

303.    As stated above, Uber knew that it faced an ongoing problem of sexual predators driving for Uber and assaulting its passengers.  As early as 2014 Uber knew that its drivers were sexually assaulting female passengers. Since 2014, Uber has received frequent passenger complaints about driver sexual misconduct, including sexual assault and rape, it has been notified of police investigations of the criminal sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

304.    Nevertheless, even though Uber was fully aware of its sexual predator problem it failed to take safety precautions to protect its passengers.

305.    Even after Uber was aware some Uber drivers were using driving for Uber as an opportunity to get unsuspecting women into their vehicle and to sexually assault them, Uber and its executing officers made the conscious decision not to implement more thoroughly vet its drivers before and after hiring them.

306.    The decision not to implement more thorough and persistent background checks was driven by Uber Executives desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

307.    Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers/users of the risk of being sexually assaulted even after they were fully aware of this risk.

308.    Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route, a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride, a system for checking in with and verifying a passenger's safety when a driver

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fox

prematurely terminates a ride or significantly deviates from the intended route ; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers, creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer service representatives, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage.  Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of sexual assault, rape, and exploitation by Uber's own drivers.

309.    Prioritizing profits over passenger safety, Uber and its executive officers acted, and continues to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiff, and the public.

310.    As a legal result of the aforementioned negligent, reckless and grossly negligent conduct of Uber, Plaintiff was sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

311.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and or psychological harm from which she may never fully recover.

312.    Uber's negligence and recklessness was a "willful and conscious disregard" of the safety of others, and therefore warrants punitive damages pursuant to California Civil Code § 3294.

313.    As a result of Uber's misconduct as stated above, Plaintiff prays for exemplary damages to punish Uber for its misconduct and to deter future misconduct.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff prays for judgment against Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC and Does 1-50 inclusive. They ask that this judgment be inclusive of all Defendants, and that they be held jointly and severally liable, as follows:

a.    For special damages, according to proof;

b.    For past and future general damages, including physical pain, mental anguish,

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone · 415.426.3001 fax

1    disfigurement and physical impairment, according to proof;

2    c.    For past and future lost earnings and/or earning capacity, according to proof;

3    d.    For medical expenses, past and future, according to proof;

4    e.    For punitive and exemplary damages, according to proof;

5    f.    For prejudgment interest from the date of Plaintiff's incidents to the date of judgment, as

6          provided by law, according to proof at the time of trial;

7    g.    For costs of litigation incurred herein;

8    h.    For attorney's fees;

9    i.    For such other and further relief as this court may deem just and proper.

10                              **<u>DEMAND FOR JURY TRIAL</u>**

11   Plaintiff hereby demands a trial by jury as to all of her claims in this action.

12

13   Dated: July 31, 2023                    **LEVIN SIMES LLP**

14                                           */s/ William A. Levin*

15                                           William A. Levin
                                             Laurel L. Simes
16                                           David M. Grimes
                                             *Attorneys for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

LEVIN SIMES LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
415.426.3000 phone • 415.426.3001 fax